UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIPSY TOAD, INC. and EMP L.L.C.,

        Plaintiffs,                                         Case No. 1:13-cv-226

v.                                                          HON. JANET T. NEFF

U.S. FIRE INSURANCE COMPANY,

        Defendant.
_____/

**OPINION**

Plaintiffs Tipsy Toad, Inc., and EMP, L.L.C., filed this insurance coverage action against Defendant U.S. Fire Insurance Company in Muskegon County Circuit Court, following a property loss from vandalism and an attempted arson. Defendant removed the case to this Court. Pending before the Court is Defendant's Motion for Summary Judgment or, Alternatively, Rule 37 Motion to Strike Pleadings (Dkt 55). Plaintiffs have filed a Response (Dkts 61, 62), and Defendant has filed a Reply (Dkt 59). Having fully considered the parties' submissions, the Court concludes that oral argument would not assist in the disposition of the issues presented. *See* W.D. Mich. LCivR 7.2(d) (the Court has discretion to schedule oral argument or dispose of a dispositive motion without argument at the end of briefing). For the reasons that follow, Defendant's motion is denied.

**I. Factual Background**

Plaintiff Tipsy Toad, Inc. operates The Tipsy Toad bar and restaurant in Muskegon, Michigan (JSMF[1] ¶¶ 1,4). Plaintiff EMP, L.L.C. owns the building in which The Tipsy Toad is

---

[1]The parties have filed a Joint Statement of Material Facts (JSMF) (Dkt 65).

located (*id.* ¶¶ 2, 7). Edward Pizunski ("Ed Pizunski") is the sole owner, member, and employee of EMP, L.L.C. (*id.* ¶ 5). Ed Pizunski's wife, Cindy Pizunski, is the President and sole shareholder of Tipsy Toad, Inc.; however, she has no day-to-day involvement in it, and could not recall the last time she was at The Tipsy Toad (*id.* ¶¶ 6, 11-12). Ed Pizunski is the Vice-President and Secretary-Treasurer of Tipsy Toad, Inc. (*id.* ¶ 6). Defendant U.S. Fire Insurance Company provided insurance coverage on the building and contents under a property casualty insurance policy (*id.* ¶¶ 3, 28).

Darlene Krause works at The Tispy Toad (JSMF ¶¶ 8-10), although her managerial role and job title are in dispute. Krause or Ed Pizunski usually opens The Tipsy Toad, more often Krause, and she has free rein to hire staff to tend to the bar and to perform as waiters and waitresses on the restaurant floor (*id.* ¶¶ 8-10). Krause held a mortgage on EMP's building that housed The Tipsy Toad, which EMP granted in 2007 in return for a $135,000 loan from Krause (Def. SMF, Dkt 57, ¶¶ 11-13). No payments had been made on the loan (*id.* ¶ 15).

The Tipsy Toad has a security alarm system that utilized four cameras hard-wired through the wall, an alarm system near the back door entrance, and a key system on the back door itself (JSMF ¶¶ 13-15, 18, 20). The cameras were located (1) over the bar; (2) concealed in a smoke detector above the kitchen doors with a view of the bar; (3) in a back hallway; and (4) outside facing toward the back alley (*id.* ¶ 16). The security alarm system was installed by Engineered Protection Systems, Inc., and the security cameras were Ed Pizunski's "baby"—he "lived and died by it" (*id.* ¶¶ 13, 17). If the alarm system was set, a person entering The Tipsy Toad had to enter an alarm code to disable the alarm system upon entering the back door, and to enter the back door, a person had to enter a code into the keypad on the back door lock (*id.* ¶¶ 19, 21). There was one general code to disable the alarm system, but each employee had a unique code for the lock system on the back

door (*id.* ¶¶ 22-23). Ed Pizunski gave a key code only to those employees who had responsibility for opening and closing, and whenever an employee was discharged, he removed the employee's key code (*id.* ¶¶ 24-25). He gave the alarm code only to employees who had responsibility for opening or closing (*id.* ¶ 27).

On January 23, 2012, after the bar closed, two individuals illegally entered The Tipsy Toad and caused damage to the interior and contents of the premises (JSMF ¶¶ 34-38). Both Krause and Ed Pizunski had worked that day, but they left prior to the The Tipsy Toad closing; another employee closed the bar (*id.* ¶¶ 34-36). The break-in was executed by "somebody who went in with the back door [sic]. Knew the code. Knew the alarm system. Knew the protocols, knew safeguards, knew everything," according to Ed Pizunski; there was no damage caused to the back door during the break-in (*id.* ¶¶ 39-40). An employee who opened the bar the next morning reported to Ed Pizunski that the back door was open and there was a gas smell; when Ed Pizunski and Krause arrived, Pizunski discovered that the gas was turned on in the kitchen on a stove (*id.* ¶¶ 41-43, 45).

The insurance policy with Defendant was in effect at the time of the break-in and vandalism (JSMF ¶ 31). The Policy provides in part as follows:

COMMERCIAL PROPERTY CONDITIONS

* * *

A. CONCEALMENT, MISREPRESENTATION OR FRAUD.

This Coverage Part is void in case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

(Dkt 58-3 at p. ID# 828; Def. SMF, Dkt 57, ¶ 18).

CAUSES OF LOSS – SPECIAL FORM

* * *

   B.  Exclusions

* * *

      2.  We will not pay for loss or damage caused by or resulting from any of the following:

* * *

      h.  Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

          (1) Acting alone or in collusion with others; or
          (2) Whether or not occurring during the hours of employment.

          This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

(Dkt 58-3 at p. ID# 836-38; Def.'s SMF, Dkt 57, ¶ 19).

On April 12, 2012, Plaintiffs submitted executed Sworn Statements in Proof of Loss to Defendant, claiming $110,225.51 in damage due to the break-in and attempted arson (JSMF ¶ 32; Def. Brf., Dkt 56 at p. ID# 685, and record citations). Defendant U.S. Fire denied Plaintiffs' insurance claim, relying on the above policy exclusions, on the grounds that Plaintiffs were involved in the entry/vandalism of the bar (Ans., Dkt 23 at p. ID# 455).

According to Defendant, Ed Pizunski initially told Defendant's investigators and attorneys that on the night of the break-in, he went home from the bar, began watching Monday Night

Football, and fell asleep (Def. Brf. at p. ID# 685). However, Verizon Wireless records show that Ed Pizunski and Krause exchanged twenty-six text messages the evening of the break-in and attempted arson, and further, most of these messages were sent after Ed Pizunski claimed to have fallen asleep (*id.*). Although a criminal investigation ensued following the break-in and attempted arson, no charges were ever filed. Defendant nevertheless asserts that there is "significant evidence" that both Ed Pizunski and Krause were involved in the break-in and attempted arson (Def. Reply, Dkt 59 at p. ID# 1169). Defendant further asserts: "Krause is one of two individuals who likely perpetrated or orchestrated the attempted arson, as the break-in required intimate knowledge of the premises, its security system, and its cameras, Ms. Krause had financial motive, and she exchanged an unusually high number of text messages with Mr. Pizunski during the time of the break-in" (*id.* at p. ID# 1173-74). Defendant acknowledges, however, that Plaintiffs deny the involvement of Ed Pizunski or Krause in the attempted arson, and that this is a disputed fact (*id.* at p. ID# 1174, n.2).

Plaintiffs filed this action seeking coverage under the policy for damages to the building and its contents from the vandalism. Plaintiffs' Second Amended Complaint (Dkt 14), alleges two counts: Count I—for Recovery on Casualty Insurance Policy (Breach of Contract); and Count II—Negligence and Bad Faith Against U.S. Fire. Defendant has asserted defenses of fraud and misrepresentation. Krause was deposed on October 10, 2013; she identified her name, address, employer, and job title, but otherwise asserted her Fifth Amendment right against self-incrimination and declined to answer questions (JSMF ¶¶ 48-52). Following the completion of discovery, Defendant filed the instant motion.

## II.  Summary Judgment Standard

A moving party is entitled to a grant of its motion for summary judgment "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer,* 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.,* 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson,* 477 U.S. at 248). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess,* 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.,* 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson,* 477 U.S. at 251-52).

### III. Analysis

Defendant's motion is premised on two underlying legal propositions (Mot., Dkt 55, at p. ID# 677, ¶ 2). First, "[a] civil litigant who invokes his or her Fifth Amendment rights does so to the peril of his or her civil claim," citing *Allen v. Michigan Basic Prop. Ins. Co.*, 640 N.W.2d 903, 908 (Mich. Ct. App. 2001). Second, "the fraudulent actions of the employee of a corporate insured may be imputed to the insured where the employee exerts sufficient control over the business," citing *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171 (6th Cir. 1996).

Defendant argues that Krause's assertion of her Fifth Amendment rights and her refusal to testify as to any material issues have prevented Defendant from obtaining discovery necessary to its affirmative defenses of fraud and misrepresentation in this action. Further, because Krause is, according to her testimony, the General Manager of The Tipsy Toad, and she holds a mortgage on the building owned by EMP in which The Tipsy Toad operates, her refusal to testify is tantamount to a refusal by Plaintiffs to testify. Defendant asserts that "Plaintiffs may not use the Fifth Amendment right against self incrimination as a shield against discovery," and therefore, Defendant is entitled to summary judgment in its favor or, in the alternative, to an order under Federal Rule of Civil Procedure 37 striking Plaintiffs' Second Amended Complaint (Mot. at p. ID# 677, ¶ 3).

Plaintiffs acknowledge the general principle expressed in *Allen*, that a civil litigant who invokes his or her Fifth Amendment rights and refuses to comply with proper discovery, does so to the peril of his or her civil claim; Plaintiffs dispute, however, that this principle has any application favorable to Defendant's motion in this case (Resp., Dkt 61, at p. ID# 1184, ¶ 2). Moreover, Plaintiffs disagree with Defendant's statement of the rule derived from *K & T Enterprises*, which Plaintiffs contend did not hold that the "fraudulent acts of the employee of a corporate insured" may be imputed to the insured to bar its claim (*id.*).

Having reviewed the authority cited and the record, the Court finds Plaintiffs' position persuasive. Contrary to Defendant's assertions, the case law does not provide definitive authority for imputing Krause's refusal to testify to Plaintiffs. Moreover, the parties' legal contentions hinge on material factual disputes, including the nature and extent of Krause's management role with The Tipsy Toad, and Krause's and Ed Pizunski's connection with the break-in and attempted arson. Thus, Defendant is not entitled to summary judgment or a sanction of dismissal under Rule 37.

A. Motion for Summary Judgment

"'The privilege against self-incrimination not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also permits him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Allen*, 640 N.W.2d at 908 (quoting *Phillips v. Deihm*, 541 N.W.2d 566, 574 (Mich. Ct. App. 1995) (citations omitted)). However, "a party to a civil action who invokes his Fifth Amendment privilege does so to the peril of his claim." *Allen*, 640 N.W.2d at 908 (citing *Phillips*, 541 N.W.2d at 574 (granting summary disposition for the plaintiff on the basis that the defendant did not respond to the plaintiff's evidence)). Accordingly, in *Allen*, the court concluded that the plaintiff's willful noncompliance with insurance policy provisions concerning her duties after a loss, including providing the defendant with documents related to her claim and submitting to an examination under oath, required dismissal of her civil action to recover under the policy for fire damage to her residence—even though the plaintiff claimed to have declined an examination under oath because of her concern over future criminal charges. *Allen, supra.*

As Defendant contends, the courts have applied a similar legal rule to circumstances involving a corporation, where the criminal acts or fraud of an individual have been imputed to the corporation to preclude an insurance claim by the insured corporation. Defendant argues that, together, these two bodies of case law support imputing Krause's refusal to testify to the insured corporation in this case. That is, a party is not entitled to pursue a coverage claim while one of its controlling agents asserts a Fifth Amendment right against self incrimination regarding the subject of the claim (Def. Brf., Dkt 56 at p. ID# 688).

The Court finds the cases cited by Defendant, imputing individual liability to a corporation, distinguishable on the facts and insufficient authority for imputing Krause's liability to Plaintiffs under the circumstances presented.

Defendant first relies on *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171 (6th Cir. 1996), asserting that the court "held that the actions of an agent who exerts sufficient control over a business may be imputed to the business" (Def. Brf., Dkt 56 at p. ID# 689). However, Defendant's characterization of the holding in *K & T Enterprises*, while perhaps technically accurate, is overgeneralized and disregards the limiting case facts.

In *K & T Enterprises*, an insured corporation-owner of a Dairy Queen franchise, brought an action against its fire insurer to recover payment for arson of the Dairy Queen perpetrated by a fifty-percent shareholder of the corporation, whose wife was the other fifty-percent shareholder and lacked any knowledge of the arson. *K & T Enters.*, 97 F.3d at 172-74. The husband worked in the cooking area of the Dairy Queen, kept the books, and performed most of the managerial tasks, such as writing checks and negotiating with banks and lessors, while his wife worked in the front of the store, decorating cakes and supervising employees there. *Id.* at 172. The issue was whether, under Michigan law applicable to contract disputes, the husband's arson[2] could be attributed to the corporation, K & T, to deny coverage under the policy's provision foreclosing coverage for losses or damage resulting from any dishonest or criminal act committed by the insured corporation. *Id.* at 177.

In addressing the "complete control test," the Sixth Circuit Court of Appeals noted that there were no Michigan Supreme Court cases and only one Michigan intermediate appellate case directly

---

[2]The husband hired a former employee to set fire to the Dairy Queen. *K & T Enters.*, 97 F.3d at 173.

9

on point, *United Gratiot Furniture Mart, Inc. v. Basic Property Ins. Ass'n*, 406 N.W.2d 239 (Mich. Ct. App. 1987). *Id.* The *K & T Enterprises* court noted that in *United Gratiot*, the court held that "'an insurance carrier may assert arson as a defense against the corporation's claim of fire loss if it is factually demonstrated that the individual who set or procured the setting of the fire exercised complete dominance and control over the affairs of the corporation.'" *K & T Enters.*, 97 F.3d at 177 (quoting *United Gratiot*, 406 N.W.2d at 242). The *K & T Enterprises* court noted, however, that "[l]imited to its facts, *United Gratiot* held only that, in a case where a shareholder *did* completely control a corporation, it was permissible for an insurance company to deny liability when that dominant shareholder committed arson." *K & T Enters.*, 97 F.3d at 177 (emphasis in original). "The facts of the case simply did not require the Michigan Court of Appeals to address the legal treatment of a situation where a 50% shareholder who was the president and sole officer, but did not completely control and dominate the corporation, deliberately burned corporate property." *Id.*

The court found *United Gratiot* instructive, but not conclusive, of what the Michigan Supreme Court would do if faced with the legal question presented in *K & T Enterprises*, i.e., "whether an arson defense can succeed under Michigan law when the arsonist-shareholder is the dominant power in the corporation, but is not in exclusive control of it." *K & T Enters.*, 97 F.3d at 177. In answer to the question posed, the *K & T Enterprises* court stated:

> Without certainty that the common law of the states generally employs the exclusive control standard as a necessary condition for an insurance company to properly refuse to pay a corporation on a fire insurance policy when arson by a corporate officer or shareholder has occurred, we see no reason to assume that the Michigan Supreme Court would extend *United Gratiot*, rather than limit it to its core holding. Because we can only decide cases under state law and not make state law, we decline to draw the line indicating to insurance companies exactly how much control a corporate officer and/or shareholder who has committed arson must possess before a refusal to pay a corporation on a fire insurance policy will be upheld. *We hold only that this line is crossed when the arsonist, who is the president and sole*

> *officer of the corporation, as well as a 50% shareholder, is married to the other 50% shareholder and the couple is neither divorced nor separated and conduct the day-to-day operations of the corporation jointly.*

*K & T Enters.*, 97 F.3d at 179 (emphasis added).

The limited context and holding of *K & T Enterprises* offers little support for Defendant's policy defense and arguments in this case for imputing Krause's conduct to Plaintiffs. Defendant asserts that Krause "exerted control over nearly all affairs of The Tipsy Toad, and holds a mortgage on the building in which The Tipsy Toad is located – a building owned by Plaintiff EMP LLC" (Def. Brf., Dkt 56 at p. ID# 680). Further, "[a]s of the date of the break-in and attempted arson, EMP LLC owed Krause $221,369.00 in principal and interest on the mortgage loan" (*id.*). However, Krause is neither a shareholder of the corporate insured nor more particularly a spouse-shareholder. Her tenuous affiliation with the insured corporation does not fall within the holding of *K & T Enterprises*. Nor do the additional cases cited by Defendant provide convincing authority for imputing Krause's refusal to testify to Plaintiffs in this case. Defendant cites *Diamond Club v. Ins. Co. of N. Am.*, 995 F.2d 1066 (Table), 1993 WL 170964 (6th Cir. 1993), as reaching a similar conclusion to *K & T Enterprises*. Defendant asserts that in *Diamond Club*, a corporation's sole shareholder gave her son the responsibility of running a night club, and after the son burned down the night club, the corporation sought insurance coverage (Def. Brf., Dkt 56 at p. ID# 690). There, the Sixth Circuit held that the actions of the son could be imputed to the corporation, even though he had no ownership interest in the corporation, based on his degree of control over the corporation and position as an officer (*id.*).

In *Diamond Club*, the Sixth Circuit addressed "the proper legal standards for determining when an arson by a corporate officer and a concealment of material information bearing on the arson

11

by that officer may be imputed to the corporation for purposes of barring the corporation's recovery under a fire insurance policy." *Diamond Club*, 1993 WL 170964, at *1. The Sixth Circuit affirmed the district court's ruling that "[the son's] position as an officer of the corporation, together with his 'substantial control' over the corporation, operated to make his concealment the concealment of the corporation." *Id.* at *1, 4. The court relied on agency principles, citing the general rule that "'A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for fraud.'" *Id.* at *4 (quoting Restatement (Second) of Agency, § 261 (1958)). The court concluded:

> Because [the son] acted within the course and scope of his duties as an officer of the corporation and manager of its restaurant when he conveyed critical information to the corporation's insurance carrier, his concealment of material information may be imputed to the corporation. Therefore, the plaintiff corporation breached the terms of its insurance contract with INA and forfeited its right to recover on the insurance policy.

*Diamond Club*, 1993 WL 170964, at *5.

Here, Krause was not an officer of the corporation, and evidence of her connection to the corporation/Plaintiffs is not analogous to the circumstances in *Diamond Club*. Nor are there analogous facts, such as a misrepresentation by her to Defendant with respect to the policy claim.

Defendant asserts finally that "Michigan courts have likewise held that the actions of non-owners can be attributed to insured corporations," citing *DKE, Inc. v. Secura Ins. Co.*, 2008 WL 4276481 (Mich. Ct. App. 2008) (Def. Brf., Dkt 56 at p. ID# 691). Defendant states that, in *DKE*, an insured corporation sought insurance coverage after its owner's son committed arson; the insured's owner's son had no ownership of the corporation (*id.*, citing *DKE*, 2008 WL 4276481, at *1). Defendant contends that "the court relied on *K & T Enterprises* in holding that if the son

12

'exercised sufficient control over the corporation's affairs, any act of arson on his part would be imputed to the corporation (the sole insured), and thus, there would be no innocent insured like there was in the [cited] cases, and defendant would be entitled to deny coverage'" (*id.*, quoting *DKE*, 2008 WL 4276481, at *2). Because, unlike in the present case, there was no record in *DKE* as to the extent of the son's control over the corporation, the court remanded the case to the trial court (*id.*, citing *DKE*, 2008 WL 4276481, at *3).

This Court finds *DKE* likewise distinguishable. In that case, the court considered whether a "dishonest and criminal acts" fire insurance policy exclusion was void because it was broader than MICH. COMP. LAWS § 500.2833, and therefore, failed to provide the minimum coverage required by law. *DKE*, 2008 WL 4276481, at *1. Defendant is correct that the *DKE* court noted that the fact that the son was not a shareholder did not require exclusion for his alleged arson under the policy's "dishonesty/criminal acts" provision, which provided:

> f. Dishonesty
>
> Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:
>
> (1) acting alone or in collusion with others;
>
> (2) whether or not occurring during the hours of employment.

*DKE*, 2008 WL 4276481 at *1, 3 n.1. The court stated that the holding in *United Gratiot* "was not dependent upon ownership of the corporation, but upon control of the corporate affairs," which was consistent with the general principle that " a corporation can be bound by the misdeeds of its agents." *Id.* at *3 n.1. The court was persuaded that the "defendant's policy could validly exclude 'criminal acts,' i.e., arson, of an authorized representative or any person to whom the property was

13

entrusted, so long as [the] defendant establishes that the representative or person to whom the property was entrusted had complete dominion and control over the affairs of the corporation."[3] *Id.* (citing MICH. COMP. LAWS § 500.2833(1)(c)) (footnote omitted).

The *DKE* court distinguished cases involving "multiple *individual* insureds, one of who was innocent of wrongdoing, the other of who [sic] was not." *DKE*, 2008 WL 4276481 at *2 (emphasis in original). In contrast to those cases, if the son "exercised sufficient control over the corporation's affairs, any act of arson on his part would be imputed to the *corporation* (the sole insured), and thus, there would be no innocent insured like there was in the aforementioned cases, and defendant would be entitled to deny coverage." *Id.* (citing *K & T Enters.*, 97 F.3d at 179).

Here, the record does not support a conclusion as a matter of law that Krause was acting as an agent such that her refusal to testify is justifiably imputed to Plaintiffs. Nor are the circumstances on point with the facts and analysis in *DKE*. More importantly, the *DKE* court ultimately was persuaded that the "defendant's policy could validly exclude 'criminal acts,' i.e., arson, of an authorized representative or any person to whom the property was entrusted, so long as defendant establishes that the representative or person to whom the property was entrusted had complete dominion and control over the affairs of the corporation." *DKE*, 2008 WL 4276481 at *3 (emphasis added). Thus, the trial court erred in ruling that the exclusion was void as a matter of law. *Id.* at *3. The court then noted:

> Exactly how much control is required is not completely clear, as *K & T Enterprises, Inc, supra* at 179, held that it was unnecessary to read *United Gratiot* so broadly as requiring the arsonist to have exclusive control over the corporation before an insurer could deny coverage. *K & T* declined to draw a bright line rule

---

[3] The court based its analysis only on "the portion of the exclusion relating to authorized representatives and persons to whom the property is entrusted," which was the basis of the defendant's denial of coverage. *DKE*, 2008 WL 4276481 at *3, n.3.

> concerning the amount of control sufficient to deny coverage, indicating only that sufficient control was proven in the specific factual scenario before it (involving an arsonist who was the president and a sole officer of the corporation, as well as a 50 percent shareholder, was married to the other 50 percent shareholder, and conducted the day-to-day operations of the corporation jointly with his wife). *Id.*

*Id.* at *3, n.2.

The court further noted that the defendant presented evidence that the son "had a very involved managerial role in plaintiff's day-to-day operations with little or no oversight." *DKE*, 2008 WL 4276481 at *3. However, because the trial court had not ruled "on the issue of whether [the son] was an authorized representative or an individual to whom the property was entrusted, and should do so in the first instance," the court remanded the case "to allow the trial court to rule on the issue, which will include a determination of whether [the son] had complete dominion and control over the affairs of the corporation under *United Gratiot*." *Id.* at *3.

It would seem then that the cases cited by Defendant end up almost where they start: with the outcome hinging on an analysis of the facts and circumstances of the case to determine whether sufficient control by the individual is proven to deny coverage to the insured corporation. In this case, it is not clear based on the authority cited, that Krause's refusal to testify is properly imputed to Plaintiffs. Even if this Court were inclined to meld the legal principles in various authority to potentially encompass a non-shareholder, employee/manager/mortgage holder of the insured corporation or business entities, no ruling would be proper as a matter of law where the facts material to Krause's management or role as an agent are disputed.

B. Rule 37 Sanctions

In the alternative, Defendant argues that it is entitled to an order striking Plaintiffs' complaint pursuant to FED. R. CIV. P. 37 for failure to cooperate in discovery. Rule 37 provides for sanctions

for a party's failure to make disclosures or to cooperate in discovery.

Defendant notes that the Sixth Circuit has held that, in considering an appropriate sanction, a court should consider four factors: (1) whether the failure to cooperate in discovery is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced; (3) whether the party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered. *Harmon v. CSX Transp.*, 110 F.3d 364, 366–67 (6th Cir. 1997) (considering a district court's decision to dismiss a complaint). Defendant contends that all four factors support dismissal, given the importance of Krause's testimony and the willfulness of her refusal to testify.

Having found no basis for imputing Krause's refusal to testify to Plaintiffs for purposes of summary judgment, the Court denies Defendant's motion in the alternative to strike Plaintiffs' pleadings under Rule 37. For the reasons discussed, the factors do not support such drastic sanctions against Plaintiffs.

### IV. Conclusion

Defendant's Motion for Summary Judgment or, Alternatively, Rule 37 Motion to Strike Pleadings is denied. An Order will be entered consistent with this Opinion.


Dated: August  22 , 2014                    /s/ Janet T. Neff
                                            JANET T. NEFF
                                            United States District Judge